UNITED STATES ex rel. RODRIGUEZ v.
WEEKLY PUBLICATIONS, Inc., et al.

District Court, S. D. New York.
Nov. 15, 1946.

See also 54 F.Supp. 476.

Pomerantz, Levy, Schreiber & Haudek,
of New York City, for plaintiffs.

Whitman, Ransom, Coulson & Goetz, of
New York City, for defendants.

RIFKIND, District Judge.

Defendants move to dismiss the amended complaint, pursuant to Federal Rules of Civil Procedure, rule 12(b) (6), 28 U.S. C.A. following section 723c, for failure to state a claim upon which relief can be granted. Plaintiff, Rodriguez, an informer, brings a qui tam action on behalf of the United States and himself to recover from defendants statutory forfeitures and double damages under the provisions of sections 5438, 3490 and 3491 of the Revised Statutes, 31 U.S.C.A. §§ 231 and 232. Defendant Weekly Publications, Inc. (hereinafter "Weekly"), is publisher of a weekly magazine, "Newsweek", and the individual defendants are its principal officers.

The amended complaint alleges as follows: Since 1937, the individual defendants entered into a conspiracy to cause defendant Weekly to present for allowance and approval false and fraudulent claims against the U. S. Government, that is, claims that the Post Office admit and carry Weekly's magazines to its subscribers as second-class mail at second-class rates.

Pursuant to statute and postal laws and regulations, the United States Government grants, upon compliance with specified conditions, a second-class mailing permit to a magazine publisher, which permits the latter to mail magazines at lower rates. One of the conditions upon which magazines are admitted as second-class matter is that the publisher shall secure, on subscription sales, at least 30% of the regularly advertised subscription price, after deducting the amount paid or allowed to soliciting employees or agents as commission or salary. To assure continuous compliance with said condition, the Postal Laws and Regulations require a publisher to submit to the Post Office Department, in advance, all contracts which he desires to make with concerns, employees and agents soliciting subscriptions.

Each week from 1937, Weekly has, under a second class mailing permit, tendered cop-

768

ies of its magazine to the Postmaster for mailing to its subscribers, representing that such copies were second-class matter. Such representations were false, and so known to be by defendants, in that Weekly received less than 30% of the regularly advertised subscription price after deducting commissions and salaries of agents and employees. By reason thereof, the magazines were not second-class matter. Defendants did not reveal to the Post Office their arrangements with agents and employees soliciting subscriptions.

In 1943 Weekly submitted to the Post Office, for approval, its arrangements with soliciting agents and employees by which Weekly received less than 30% per subscription. These arrangements were in fact those theretofore in effect. Defendant falsely represented that such arrangements were merely those to be put into effect in the future. Approval was denied.

In reliance upon the aforementioned representations, the Post Office Department, since 1937, has allowed Weekly's claim that it be charged second-class rates, instead of higher rates. By reason of defendants' false claim, defendants paid $1,303,000 less than they should have, thereby causing damage to the United States in that sum. Defendants are liable to the United States for double the damages and statutory forfeitures.

The statute under which the action is brought provides, 31 U.S.C.A. § 231: "Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, * * * or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; * * *."

As provided by 31 U.S.C.A. § 232, subd. (B), "such suit may be brought and carried on by any person, as well for himself as for the United States * * *."

The determination of the motion to dismiss depends upon the meaning of "make or present, for payment or approval, any claim upon or against the United States", under section 231.

As to the purpose of the informer's statute, the court, in United States v. Griswold, D.C.Or., 1885, 24 F. 361, affirmed 9 Cir., 30 F. 762, said at page 366 of 24 F.: "The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain".

In other words, the purpose is to prohibit the drawing of any money from the treasury of the United States by false or fictitious claims.

The informer's statute did not receive kindly treatment in United States v. Bausch & Lomb Optical Co., 2 Cir., 1942, 131 F.2d 545, at page 547, wherein the court said: "This would be the necessary result were the statute of the usual kind and entitled to a broad interpretation; but it is not, for it is not only penal, but drastically penal. [Cases cited.] For this reason it has been strictly construed." citing, among others, United States ex rel. Marcus v. Hess, 3 Cir., 127 F.2d 233, 235. The court continued: "Furthermore, so far as it perpetuates the odious and happily nearly obsolete qui tam action, it should be regarded with particular jealousy".

The Bausch & Lomb case was affirmed, without opinion, by an equally divided court in November, 1943; 320 U.S. 711, 64 S.Ct.

187, 88 L.Ed. 417, rehearing denied 320 U.S. 814, 64 S.Ct. 256, 88 L.Ed. 492.

The Hess case, supra, which was cited with approval by the Court of Appeals in the Bausch & Lomb case, was reversed, however, by the Supreme Court in January, 1943; 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, rehearing denied 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163. The informer's statute received a much more cordial reception in the Supreme Court; page 544 of 317 U.S., page 384 of 63 S.Ct., 87 L.Ed. 443. The court said at pages 540–542 of 317 U.S., at page 382 of 63 S.Ct., 87 L.Ed. 443:

"The Court below, construing § 5438 [31 U.S.C.A. 231] with 'utmost strictness' on the premise that qui tam or informer actions 'have always been regarded with disfavor' by the courts, emphasized the absence of a direct contractual relationship between the respondents and the United States, and held that 'The claims of the defendants then were simply against the local municipalities. Since the defendants had no claim upon or against the United States, this action was not authorized by the informer statutes.'

"We cannot accept either the interpretive approach or the actual decision of the court below. Qui tam suits have been frequently permitted by legislative action, and have not been without defense by the courts. * * *.

"Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it; * * *."

The court continued, at page 549 of 317 U.S., at page 386 of 63 S.Ct., 87 L.Ed. 443: "Is the action now before us, consisting of double damages and the $2,000 forfeiture, criminal or remedial? It is enough for present purposes if we conclude that the instant proceedings are remedial and impose a civil sanction."

▉ Sections 226 of Title 39 U.S.C.A., sets forth the conditions upon which a publication shall be admitted as second-class matter, one of which is that the publications have "a legitimate list of subscribers. Nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily * * * for circulation at nominal rates".

Postal Laws and Regulations, 1940, section 526, 39 C.F.R. 5.27(c) (2), provides:

"3. The methods of a publisher * * * in inducing subscriptions * * * by giving commissions upon subscriptions obtained by agents, shall be carefully scrutinized in respect of their effect upon the legitimacy of the subscription list and upon the question of the primary design of the publication. Persons whose subscriptions are obtained at a nominal rate shall not be included as a part of the 'legitimate list of subscribers' required by the law. Subscriptions shall be regarded as at a nominal rate when obtained in connection with the methods of offers effecting a reduction of the regular advertised annual subscription price to the extent and under the conditions set forth in the following sub-paragraphs (a) and (b):

 ＊ ＊ ＊ ＊ ＊ ＊

"(b) Subscriptions obtained through agents or agencies on commission * * * in cases where the amount received by the publisher, after deducting the amount allowed or paid as commission, or as a rebate, or through other arrangement, is less than 30% of the amount at the regular advertised subscription price of the publication. Contracts which a publisher desires to enter into with a person or concern who will obtain for the publisher subscriptions through soliciting agents should first be submitted to the Third Assistant Postmaster General, Division of Classification, together with all of the conditions, facts, and circumstances pertaining thereto, in order that it may be determined whether subscriptions obtained in connection therewith will be in harmony with the requirements of the law governing second-class matter".

The second-class privilege is granted only on application of a publisher for entry of his publication to that class. "Upon such an application, a searching investigation of the character of the publication is made by the Postmaster General, under rules and regulations prescribed by him, which experience has proved necessary to prevent frauds upon the government". If a publication is entitled to admission as second-class matter, a permit to that effect is issued. United States ex rel. Milwaukee

Social Democratic Pub. Co. v. Burleson, 1921, 255 U.S. 407, 415, 41 S.Ct. 352, 65 L.Ed. 704; Postal Laws & Regulations, 1940, sec. 531, 39 C.F.R. 5.32 (1939).

Admission as second-class matter, although frequently referred to as a privilege is a "must" for publishers. Esquire, Inc., v. Walker, C.A.D.C., 1945, 80 U.S.App. D.C. 145, 151 F.2d 49, 51, aff. sub nom. Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 66 S.Ct. 456.

It is a form of subsidy through extremely low postal rates, and a huge subsidy in many instances. It was found to be worth $500,000 a year to Esquire Magazine. Hannegan v. Esquire, Inc., supra, 327 U.S. at page 151, 66 S.Ct. at page 459; United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, supra, 255 U.S. at page 410, 41 S.Ct. at page 353, 65 L.Ed. 704; Houghton v. Meyer, 1908, 208 U.S. 149, 160, 28 S.Ct. 234, 52 L.Ed. 432; Lewis Publishing Co. v. Morgan, 1913, 229 U.S. 288, 316, 33 S.Ct. 867, 57 L.Ed. 1190.

As to the nature of a publisher's right to send his publication as second-class matter, the court said, in Payne v. United States ex rel. National Ry. Pub. Co., 1902, 20 App. D.C. 581, certiorari granted 189 U.S. 512, 23 S.Ct. 857, 47 L.Ed. 924, appeal dismissed 192 U.S. 602, 24 S.Ct. 849, 48 L.Ed. 583 (at page 598 of 20 App.D.C.): "The citizen who desires to have his publication carried in the mails of the United States as second-class mail matter, and who has fully and fairly complied with all the requirements of the statute in regard thereto, has acquired a positive legal right to have it so carried; and his right will be enforced by the writ of mandamus, if the Postmaster General arbitrarily or without valid legal reason refuses to receive and transmit such publication". See United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, supra, 255 U.S. at page 432, 41 S.Ct. at page 361, 65 L.Ed. 704 (dis. op., per Brandeis, J.).

When defendants presented their magazines to the post office to be mailed as second-class matter, they, in effect, represented that their publication was properly mailable as such, and they also thereby demanded from the Government of the United States, as a matter of right, that the government carry the publications through the mails at a rate less than it was entitled to charge, but for the fact that it was represented to be second-class matter. Such a demand was a claim. By their conduct, the defendants did make or present, for payment or approval, a claim upon the post office department, within section 231 of Title 31.

As defined by Funk & Wagnalls, New Standard Dictionary, 1941, a claim is "the demand of something from someone on the ground of right; * * * the affirming of a debt, obligation, or the like, from another". The conduct complained of. in this action falls within the fair intendment of the statute.

As to various legal meanings attributed to the word "claim", see United States ex rel. Marcus v. Hess, 3 Cir., 1942, 127 F.2d 233, 236, reversed 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443; United States v. Byron, D.C.Or., 1915, 223 F. 798, 800.

Defendants place great reliance on United States v. Cohn, 1926, 270 U.S. 339, 345, 346, 46 S.Ct. 251, 253, 70 L.Ed. 616, and contend that the claim must be one "for money or property". It is not to be so limited. See United States v. Wilcox, N.D.,N.Y. 1859, 28 Fed.Cas 597, 598, No. 16, 691, 4 Blatchf 385.

Even if we were to say that the claim must be for money, such was the claim made by defendants when it demanded, as of right, a substantial postal subsidy. Let us suppose that it was permissible for defendants to mail their magazines at regular postage rates, and then, subsequently, to submit to the post office a demand or claim for a remission of part of the postage paid on the ground that the publication was entitled to second-class rates. This would not be unlike a claim for a refund of taxes. Certainly, if the demand or claim by the publisher were false, such misconduct would come within the statute. I see no real difference in the present situation, but merely a difference in bookkeeping form.

Furthermore, when the post office accepted defendant's publication for mailing as second-class matter, it thereby approved de-

fendant's claim, or demand as of right, for such beneficial use of the postal facilities.

The amended complaint states a claim upon which relief can be granted. The motion to dismiss is, therefore, denied.